**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| CHRISTOPHER M. WARMAN, SR.; TRUST FOR FAMILY OF CHRISTOPHER M. WARMAN, SR.; CHOCOLATE MOONSHINE CO., LLC, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLES BRIAN GRIFFIN; CM CHOCOLATIER, LLC DBA COPPER COAST CONFECTIONS, <br><br> Defendants. | Civil Action No. 2:23-cv-876 <br><br> **JURY TRIAL DEMANDED** <br><br> *Electronically Filed* |

## COMPLAINT

Plaintiffs, Christopher M. Warman, Sr. ("Warman"), Trust for family of Christopher M. Warman, Sr. ("Trust"), and Chocolate Moonshine Co., LLC ("Moonshine Co.") (collectively, "Plaintiffs"), through their undersigned counsel, allege the following in this Complaint against Defendants, Charles Brian Griffin ("Griffin") and CM Chocolatier, LLC doing business as Copper Coast Confections ("Chocolatier" or "Chocolatier/CCC") (collectively, "Defendants").

## THE PARTIES

1.      Plaintiff, Warman, is an individual that resides at 193 Birch Court, Pittsburgh, PA 15237.

2.      Plaintiff, Trust, is a trust with a mailing address at 1911 Leesburg Grove City Road, Suite 130, Grove City, PA 16127.

3.      Plaintiff, Moonshine Co. is a Pennsylvania limited liability company operating out of a principal place of business at 1911 Leesburg Grove City Road, Suite 130, Grove City,

PA 16127.

4.    Defendant, Griffin, an individual, on information and belief, resides at 2317 Jane Street, Pittsburgh, PA 15203.

5.    Defendant, Chocolatier, a Pennsylvania limited liability company doing business as "Copper Coast Confections," on information and belief, has a principal place of business at 2024 Larkins Way, Floor 2, Pittsburgh, PA, 15203 and also operates out of 1622 William Flynn Highway, Glenshaw, PA 15116.


## JURISDICTION

6.    This is an action for: (i) trademark infringement under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); (ii) tortious interference under Pennsylvania law; (iii) conversion under Pennsylvania law; (iv) breach of contract under Pennsylvania law; and (v) unjust enrichment under Pennsylvania law.

7.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

## VENUE

8.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c). Defendants reside in this district and a substantial part of the events and transactions occurred in this district.

## FACTS

9.    Moonshine Co. is a successful company started in 2012 by Warman, President and Chief Executive Officer of Moonshine Co. Moonshine Co. has been and currently is in the business of creating, manufacturing and selling world famous proprietary chocolate and fudge

products under the marks CHOCOLATE MOONSHINE, CHOCOLATE MOONSHINE CO. and CHOCOLATE MOONSHINE CO. ILLEGALLY GOOD ("Plaintiffs' Marks").

10.     Warman and Moonshine Co. have been using Plaintiffs' Marks for the manufacture and sale of chocolate and fudge products continuously since at least 2013 in physical locations around the United States and on their website since at least 2015. Evidence of the continuous use of Plaintiffs' Marks in commerce are attached hereto as follows: **Exhibit 1** is an order form, dated September 9, 2013, for chocolate and fudge products under the CHOCOLATE MOONSHINE CO. ILLEGALLY GOOD mark; **Exhibit 2** is a copy of a "Sales by Customer Summary," dated February 19, 2014, showing the CHOCOLATE MOONSHINE CO. mark and a list of candy customers; **Exhibit 3** is a copy of a Candy Industry Magazine article from 2015 featuring the CHOCOLATE MOONSHINE CO. mark and Plaintiffs' chocolate and fudge products, dated April 24, 2015; **Exhibits 4 through 7** are photographs of the CHOCOLATE MOONSHINE CO. ILLEGALLY GOOD Pop-Up kiosks featuring Plaintiffs' chocolate and fudge products at annual Bedford, PA events in 2016, 2017, 2018, and 2019, respectively; **Exhibit 8** is a collage of photographs showing Plaintiffs' Marks at various Moonshine Co. stores and events around the United States from 2013 to 2022; **Exhibits 9 and 10** are digital screenshots of Moonshine Co.'s website www.chocolatemoonshine.com (taken from the Internet Archive's WayBack Machine at archive.web.org; accessed May 8, 2023[1]), showing the sale of chocolates and fudge under the CHOCOLATE MOONSHINE CO. ILLEGALLY GOOD mark in 2016; and **Exhibit 11** is a digital screenshot of the main page for www.chocolatemoonshine.com, showing that a bot picked up Plaintiffs' website ninety-seven

---

[1] The Wayback Machine is a digital internet archive founded by the Internet Archive in 1996 and launched to the public in 2001, in which a bot periodically crawls millions of websites and then stores the information on the internet for historical purposes.

times from 2015 through March, 2023.

11.     Warman's son, Christopher M. Warman, Jr. ("Chris, Jr.") met Griffin in college. They became friends and Griffin frequently came over to the Warman's household.

12.     Griffin started working for Warman and his then wife Christine Falvo ("Falvo") at chocolate and fudge company named "Fudgie Wudgie." Warman had developed a unique Pop-up kiosk event show format and by 2008 Fudgie Wudgie had become the largest fudge company in the United States. By 2011, Fudgie Wudgie had achieved sales of over 34 million dollars.

13.     In 2011, Warman and Falvo separated and Warman and Chris, Jr. created a new fudge company named "Fudgetopia," with Warman as owner and Chris, Jr. as general manager.

14.     Falvo was successful in taking a portion of Fudgetopia customer accounts away from Warman and Chris, Jr. as well as selling Plaintiffs' proprietary fudge recipe, causing Warman a loss of over one million dollars.

15.     As a result of Falvo's actions, in 2012 Warman formed Moonshine Co. for manufacturing and selling his proprietary chocolate and fudge products under the "CHOCOLATE MOONSHINE, CHOCOLATE MOONSHINE CO., and "CHOCOLATE MOONSHINE CO. ILLEGALLY GOOD marks.

16.     In 2014, fearing another theft of their business by his stepmother Falvo, Chris, Jr. filed a trademark application *pro se* for the mark CHOCOLATE MOONSHINE CO. in Class 30 for chocolates, fudge, and related chocolate products. Having little or no knowledge of trademark law, Chris, Jr. cited himself as the Applicant, as he wanted to protect Warman from further interference by Falvo. The trademark registered in 2015. In 2021, when Chris, Jr. did not file the requisite Sections 8 &15 affidavits, the trademark registration was unintentionally cancelled.

17.     During this time, Griffin was serving a prison sentence for conspiring to fraudulently sell oxycodone pills. After his release from prison and having been told by Chris, Jr. of Moonshine Co.'s rapid success, Griffin approached Chris, Jr. with the idea of selling Warman's chocolates and fudge products at event shows in the same way that Warman was selling these products, i.e., using his unique Pop-Up kiosk. According to Chris, Jr., Griffin said that the "Chocolate Moonshine" brand "was gold" and that he could make a fortune selling the chocolate and fudge products under this brand name.

18.     Warman agreed with Griffin's proposal, as he wanted to help Griffin get back on his feet after his release from prison, and so Warman hired Griffin as a sales representative of Moonshine Co. As a sales representative of Moonshine Co., Griffin was authorized to sell Plaintiffs' chocolate and fudge products under Plaintiffs' Marks.

19.     In 2015, Warman proceeded to give Griffin a multi-million dollar entry into Warman's Pop-Up event business by placing Griffin in his first Chocolate Moonshine-branded event at the Steel City Comic Con in Pittsburgh, then afterwards in other candy shows, such as the international candy show in Chicago and the Philadelphia national candy show.  At each event, Griffin represented Chocolate Moonshine-branded chocolate and fudge products as .Warman and Moonshine Co. had been participating in in such candy shows as well as convention events such as Comic Cons, Anthrocons/Furry Cons and related convention events around the United States to exhibit and sell their chocolate and fudge products for at least ten years before Griffin's employment at Moonshine Co.

20.     Griffin proceeded to successfully sell chocolate and fudge products as a sales representative under the Chocolate Moonshine brand and CHOCOLATE MOONSHINE ILLEGALLY GOOD mark in Comic Cons throughout the United States. In addition, Griffin

sold Moonshine Co. chocolate and fudge products for several years in Wegmans grocery stores as a direct sales representative for Moonshine Co.

21.     In 2017, after working with Warman in Comic Con events and candy shows around the country, Griffin and Chris, Jr. entered into a formal business relationship where they would sell Plaintiffs' chocolate and fudge products under Plaintiffs' Marks at events throughout the United States as well as at a brick-and-mortar location located in Lawrenceville, PA. and Warman would receive a royalty from the sale of Plaintiffs' chocolate and fudge products by Griffin and Brian, Jr.

22.     In April 2017, to Griffin's great satisfaction, he and Chris, Jr. formed CM Chocolatier, LLC (i.e., Defendant Chocolatier/CCC). Attached hereto as **Exhibit 12** is an executed CM Chocolatier LLC Operating Agreement, which provided that Chris, Jr. owned a 60% share of the company and Griffin owned a 40% share of the company. In addition, Warman gave Chocolatier a license to sell Plaintiffs' chocolate and fudge products under Plaintiff's Marks.

23.     It was understood by both Griffin and Chris, Jr., pursuant to a license that Warman and Moonshine Co. gave to Chocolatier, that **as long as Chris, Jr. was the majority owner of Chocolatier** and **as long as Griffin did not damage Plaintiffs Marks and the goodwill attached thereto in any way,** Griffin could sell Plaintiffs' chocolate and fudge products under Plaintiffs' Marks. Both Griffin and Chris, Jr. also understood that if either one of these two conditions occurred, Warman's license to Chocolatier would be revoked and Griffin could no longer sell Plaintiff's chocolate and fudge products under Plaintiffs Marks.

24.     Chocolatier was a success, quickly grossing over one million dollars in sales under Plaintiffs' Marks.

25.     A photograph of Griffin and Chris, Jr. (Griffin is on the right) celebrating the opening of their retail store CHOCOLATE MOONSHINE CO. in 2017 in Pittsburgh, PA is attached hereto as **Exhibit 13**, and a photograph of their brick-and-mortar storefront taken in 2017 is attached hereto as **Exhibit 14.**

26.     In 2018, Warman informed Griffin that he had not been receiving royalties from Plaintiff's chocolate and fudge products under Plaintiffs' Marks and, more importantly, Warman discovered that key funds were being illegally diverted away from Moonshine Co. When Griffin as well as Chris, Jr. confronted Griffin regarding this illegal activity, surprisingly, Griffin refused to say he would stop, stating instead that he was making a fortune selling fudge.

27.     Further, Griffin then proceeded to deceive dozens of Comic Con promoters and other related event promoters that he was the owner of Moonshine Co. and was rebranding Moonshine Co. to "Chocolate Fusion," which caused a loss of revenue to Warman and Moonshine Co. of over one million dollars. In addition, Griffin also was selling Plaintiffs' chocolate and fudge products, which Griffin procured from Falvo, Warman's then estranged wife, who allegedly misappropriated Plaintiffs' trade secret fudge recipe.

28.     About one year later, when he was unable to register the "Chocolate Fusion mark," Griffin rebranded again to "Copper Coast Confections" (Chocolatier's now fictitious name).

29.     Evidence of Griffin's fraudulent statements, actions, and misappropriation of Plaintiffs' chocolate and fudge products as well as the trade secret fudge recipe is attested to in an affidavit by Scott Wolpow ("Wolpow"), attached hereto as **Exhibit 15,** a vendor who attended many Comic Con events throughout the years and who knew Griffin due to Griffin's frequent participation in these events as an employee and sales representative for Moonshine

Co. In his affidavit, Wolpow states that in 2018 at the Greater Philly Comic Con event he met Jeff and Anne Wateska, a long time client of Chocolate Moonshine Co., who were exhibiting and selling Plaintiffs' chocolate and fudge products at the event. Then, in 2019, he saw Griffin at the TerrifiCon event in Connecticut selling chocolate and fudge products under the name "Chocolate Fusion." When Wolpow asked about the name change, Griffin said that he decided to make the name change as he was a principle in the Chocolate Moonshine Co. business. A few months later, Wolpow found out that the name was changed again to Copper Coast Confections. After that, at all the events Wolpow attended, the Chocolate Moonshine name no longer was being used but instead the chocolate and fudge products were being sold under the name Copper Coast Confections. Wolpow states that it therefore was "a big shock" when in 2021 at a New Jersey convention event he saw Jeff Wateska again using the Chocolate Moonshine name. Wolpow then states that he told Jeff that he was glad the company went back to that name and, according to Wolpow, to his surprise, Jeff told him "that the company had never rebranded their name and that Brian had stolen the 'Chocolate Moonshine' fudge recipe which was a trade secret and was selling it under his own brand name.

30.     On August 13, 2019, Warman, through his attorney, sent Griffin a Cease and Desist letter ("C&D letter"), demanding that he stop selling Plaintiffs' chocolate and fudge products under Plaintiffs' Marks. A copy of this letter is attached hereto as **Exhibit 16**. Thus, on August 13, 2019, when Warman sent Griffin this C&D letter, Warman's license to Defendants to sell Plaintiffs' chocolate and fudge products under Plaintiffs' Marks was revoked.

31.     After receiving the C&D letter, Griffin agreed that he would stop using the CHOCOLATE MOONSHINE mark. Griffin, however, continued to use Plaintiffs Marks, as shown in **Exhibit 17** attached hereto, which is a photograph of Griffin with two assistants

(Griffin is on the right) at a Florida Fair event in 2019 showing him with the CHOCOLATE MOONSHINE CO. ILLEGALLY GOOD mark in the background.

32.     Further, Griffin continued to deceive dozens of event promoters that he owned Moonshine Co. and had rebranded the company to Copper Coast Confections as well as continuing to misappropriate Plaintiffs' chocolate and fudge products from Falvo.

33.     Based on Griffin's fraudulent, deceptive, and malicious actions against Warman and Moonshine Co., Chris, Jr. wanted nothing more to do with Griffin and Chocolatier and sold his 60% share of the business to Griffin. A "Membership Interest Purchase Agreement" (i.e., Buyout Agreement) was executed in December, 2019. Copies of the Buyout Agreement with Griffin's and Chris, Jr.'s signatures are attached hereto as **Exhibits 18** and **19,** respectively. On information and belief, Griffin currently is the sole owner of Chocolatier.

34.     Since at least 2019, Griffin has been deceiving event promoters that he is the owner of Moonshine Co. and was rebranding the company. Griffin's deceptive actions was successful in blocking Warman and Moonshine Co. from participating in Comic Cons and other related events around the United States, causing them millions of dollars of lost revenue.

35.     Specifically, in 2019 Griffin fraudulently interfered with a major business relationship that Warman and Moonshine Co. had with Wizard World/Fan Expo, which operates between 13-17 convention events every year. Moonshine Co. had a "cult-like" following at the Wizard World events. This prompted Joe Alvino Jr. ("Alvino"), vice-president in charge of Wizard World Operations, to ask Warman and Moonshine Co. to exhibit their chocolate and fudge products at **all** of the Wizard World events each year, as Moonshine Co. had become an integral part of the success of their events. Warman happily agreed, and Moonshine Co. became the primary "sweets provider" for all Wizard World events.

36.    At about the same time, Griffin approached Wizard World event promoters and told them Moonshine Co. was rebranded to Copper Coast Confections. The event promoters, who were used to seeing Griffin at the Wizard World shows as a Moonshine Co. sales representative, believed what Griffin told them.

37.    Warman was informed by one of the Wizard World show promoters what Griffin had told them regarding Griffin's rebranding of Moonshine Co. Alarmed, Warman alerted the owners of Wizard World of Griffin's deception. Because Wizard World only allowed one "sweet provider" at their shows, Warman was told by the owners that they were sorry but they had already signed a sponsorship agreement with Griffin's Copper Coast Confections company and that it was too late for it to be reversed.

38.    After this, on only **one** occasion and only after three years, was Warman and Moonshine Co. allowed to participate in a Wizard World event. (In 2022, six of Wizard World's largest events, i.e., in Chicago, Philadelphia, New Orleans, Portland, St. Louis, and Cleveland, joined the Fan Expo portfolio of events and was rebranded "Fan Expo"). This one exception, at the Rosemont Convention Center Fan Expo show in Chicago, only occurred because Moonshine Co. had a contract to provide its chocolate and fudge products, i.e., be a "sweets provider," with Aramark, a retail vendor participating in the Chicago Fan Expo event.

39.    This single event, over a 4 day weekend, realized sales of $45,071.16 for Moonshine Co. (see sales report attached hereto as **Exhibit 20**).

40.    It is reasonable to estimate that if Warman and Moonshine Co. had participated in only 13 of the approximately 17 shows held that year, Moonshine Co. would have realized about $586,000.00 with this one promoter.

41.    It is also reasonable to estimate that if Warman and Moonshine Co. had

participated in all 17 shows that might have been held that year, Moonshine Co. would have realized about $766,000.00 with this one promoter.

42.     In 2019, Plaintiffs filed Civil Action No. 2:19-cv-01224 in the Western District of Pennsylvania ("Civil Action"), naming Griffin and Chocolatier as two of the five defendants[2] in a thirteen count complaint which included, *inter alia*, misappropriation of trade secrets, trademark infringement, tortious interference, unjust enrichment, civil conspiracy, and defamation. As of this date, the civil action is still ongoing.

43.     After the Complaint was filed, Griffin again agreed to stop using the Chocolate Moonshine mark and to stop selling Plaintiffs' chocolate and fudge products.

44.     However, in 2020, on information and belief, Griffin gained access to Moonshine Co.'s customers who were on Moonshine Co.'s email marketing list. Griffin proceeded to send out emails to promote his "Chocolate Fusion" business[3], in which he sold counterfeit Chocolate Moonshine chocolate and fudge products, created a website that looked confusingly similar to the Moonshine Co.'s website, formatted his promotional emails almost identically to Moonshine Co.'s promotional emails, and offered a promo code for a 20% discount which customers confused with Moonshine Co. Such fraudulent actions by Griffin have caused fear, confusion, and anxiety among Warman's customers as well as great financial loss to Warman and Moonshine Co.

45.     Specifically, in December 2020, Chris, Jr. received an email from a customer, Corey Anne Stickel, in which she informed him that she received an email from "some place in Pittsburg [sic] called 'Chocolate Fusion,'" which she had never heard of nor ordered from them.

---

[2] The other three named defendants are Falvo, Don Konieczny ("Konieczny"), and Local Yokels Fudge, LLC.
[3] Griffin curiously has shifted back and forth between brands from 2019 to the present time.

She further states that:

> it set off some serious alarm bells because not only was the e-mail's formatting identical to Chocolate Moonshine's promotionals, but their website (www.chocolatefusioncandy.com) is selling the exact same fudge (even down to the names) that you guys do." Their website is really convincing, and I was actually confused for half a second, wondering if you guys had moved from Grove City to Pittsburg [sic] and changed the company name; but your company has always been upfront about things so I knew it couldn't be you. I don't know if this 'Chocolate Fusion' is affiliate of yours, if they're a scam or trying to poach your customers, or if it's all a giant coincidence. Hopefully it ends up being nothing serious, but I thought I should let you know there's a 'mimic' store out there that's a convincing knock-off.
>
> A copy of this email is attached as **Exhibit 21**.

46.     In January, 2021, in another email sent to Chris, Jr. by a customer, Krissa Lichvarcik, she states that she received a "newsletter to use the promo code Truffle20 to get 20 percent off and it says I can't use the promo." In the email, Lichvarcik attached a screenshot of the "Chocolate Fusion" promotional email she received showing the promo code on page 3. Lichvarcik's email and Griffin's promotional email are attached hereto as **Exhibit 22**.

47.     In 2022, Griffin fraudulently interfered with Warman and Moonshine Co. participation in a major event, known as "Anthrocon/Furry Con," held annually in Pittsburgh, PA, by holding himself out as the owner of Moonshine Co.

48.     Specifically, Griffin contacted Tim Mithee ("Mithee"), co-director of the Anthrocon/Furry Con event, in which Griffin informed Mithee that he was the owner of Moonshine Co.; that he had rebranded the company to "Copper Coast Confections;" and that he wanted all Moonshine Co. signage, advertising and vendor listings on Mithee's website removed and changed to Copper Coast Confections. Mithee complied with Griffin's orders.

49.     The booth assigned to Moonshine Co. already was paid for by Moonshine Co., but when Warman and Moonshine Co.'s event coordinator, Brandon Krause ("Krause") arrived

at the event, they found a Copper Coast Confection sign on their assigned booth.

50.      Krause sent Mithee an email on the morning of June 27, 2022, asking to speak with him at his earliest convenience about Moonshine Co.'s booth. Mithee replied that he was in "something of a 'crunch mode'" and that it would be better to communicate via email. Krause replied:" As I was reviewing our booth location and everything the booth is under the wrong company name and wanted to get that cleared up." Mithee replied: We've updated [your name] recently to Copper Coast Confections on the website, and any signage we have … will show the proper name. It was an oversight on my part that it was left as the older name as long as it was." Krause replied: "The company name is Chocolate Moonshine though." Mithee replied: "We were notified on June 2nd by a Brian Griffin that the company had rebranded to Copper Coast Confections and we needed to change our information to match that. Is this not the case?" A copy of this email string is attached hereto as **Exhibit 23**.

51.      Krause replied to Mittee in a lengthy email, stating in pertinent part:

> Christopher Warman Sr. & his son Christopher Warman Jr. have been doing the Steel City Con for 20 years. We introduced a Colledge [sic] friend of Chris Warman Jr's by the name of Brian Griffin in 2016 to the Comicon sector of Business. Brian was 100% supported by Chocolate Moonshine Co. [t]o travel and represent Chocolate Moonshine at the Comicons/Anime and at Anthrocn. Brian Griffin worked exclusively selling the Handpainted Moonshine Truffle bars and Fudge from Chocolate Moonshine Co.
>
> Heartbreakingly, we have been the victim of deception and being knocked off. He has replicated our Hand Painted Truffle Bars and Fudge and is slyly telling the Promoters Companies that had successfully had Chocolate Moonshine Company exhibiting at their shows that he has rebranded. This is completely inaccurate and deceptive. Chocolate Moonshine Co. has been forced to take him [to]…federal court…[for] trademark infringement and multiple other counts.
>
> Chris Warman Sr. was at Anthrocon multiple times. He had specifically asked [me]…to apply and pay for the show last year. We

did that and presently have our staff and the product made for the show for this forthcoming weekend. We have an acceptance letter stating that we have been accepted to the show. We plead to you for protection from being knocked off by this Brian Griffin individual. You could look at his website he is even boldly replicating the look and feel of our products. This deception has gone very deep being knocked off. You can see this on his website. We plead for your help. We try to be the consummate professionals and are simply asking for protection.

52.     Mithee replied to Krause, stating, in pertinent part:

We've been reviewing the situation and prior communications, and we came to roughly this conclusion, that Mr. Griffin had separated from Chocolate Moonshine and was either attempting to convince us or believed incorrectly that he was entitled to your booth at the convention.

Because the registration is in your name, the booth is contractually yours, and Anthrocon guarantees that it will be available for you and your business at the upcoming event. I've had the dealership name reverted to Chocolate Moonshine on our digital materials; it should still be that on our printed ones.

I'd like to deeply apologize for the confusion and anxiety this has likely caused. This is a rather unprecedented situation. We will be notifying Mr. Griffin directly that he has no vending space at the convention.

A copy of this email string is attached hereto as **Exhibit 24**.

53.     This flagrant deception by Griffin has caused harm to Warman, Moonshine Co. and its employees by the stress and unnecessary harassment to prove to the Anthrocon/Furry Con event promoter that Warman owned Moonshine Co.

54.     In addition, Griffin's continued interference with Warman's Moonshine Co. has confused other event promotors as to who is the rightful owner of Moonshine Co., causing them to hesitant to accept Chocolate Moonshine's application to participate in their events.

55.     Further, Griffin's dishonesty and intentional, malicious deceptions also has

resulted in catastrophic damage to Moonshine Co.'s stellar reputation in the industry.

56.     On April 13, 2022, Griffin, with Chocolatier as the Applicant, filed a trademark application through his attorney, along with a Petition to Make Special to expedite registration, of the mark CHOCOLATE MOONSHINE on a 1(b), intent to use basis in Class 30 with a description of goods and services of "Chocolate; Fudge."

57.     In its trademark application, Chocolatier fraudulently averred that "[t]o the best of signatory's knowledge and belief, **no other persons…have the right to use the mark in commerce, either in the identical form in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive**." (bold added).

58.     After filing an Amendment to Allege Use, Chocolatier's trademark registration (Reg. No. 6,821,135) ("challenged trademark") was issued on August 16, 2022.

59.     On August 31, 2022, Plaintiffs filed a Petition for Cancellation in the Trademark Trial and Appeal Board ("TTAB") challenging Griffin's trademark registration on two grounds: Priority and Likelihood of Confusion; and Fraud on the USPTO.

60.     Since receiving the challenged registration in 2022, Griffin has continued to fraudulently claim that he is the owner of Moonshine Co. Griffin's fraudulent and egregious actions have caused many of Plaintiffs' key business contacts and retail vendors to stop working with Warman and Moonshine Co. as well as severely jeopardizing future business plans with these key business contacts and retail vendors.

61.     Specifically, in 2023, Griffin's now business partners, Falvo and Konceiczny (and co-defendants along with Griffin in the Civil Action), contacted Jeff and Anne Wateska ("the Wateskas"), the long-time client of Moonshine Co. mentioned above in Wolpow's

affidavit. The Wateskas had been operating 123 unique Pop-Up kiosk events that Warman created throughout the United States, selling Plaintiffs' chocolate and fudge products under the Chocolate Moonshine mark. Annual sales from these events brought in approximately one million dollars a year.

62.    Griffin, through his partners Falvo and Konciezny, fraudulently informed the Wateskas that Griffin owned the Chocolate Moonshine brand, that Griffin was going to inform Warman's national sales network that he was going to sue them for using his mark, and that they all would be out of business.

63.    Further, Griffin then proceeded to copy, i.e., "mimic," the Wateskas' business operation, to slander them, and successfully blocked them from participating in convention events.

64.    As a result of Griffin's fraudulent actions, the Wateskas told Warman that this caused a tremendous loss in business. Becoming alarmed for their livelihood, as Griffin had already prevented them from participating in convention events and because they feared litigation by Griffin, the Wateskas discontinued their business relationship with Warman and Moonshine Co., and now sell chocolate and fudge products under the "Oh Wow Fudge!" mark. This has cost Moonshine Co. a loss in revenue of millions of dollars.

65.    Further, in 2023, Griffin, through his attorney, started sending out C&D letters to several of Moonshine Co.'s key business partners and retail vendors, threatening to sue them for using the CHOCOLATE MOONSHINE challenged trademark. Attached to each C&D letter was a copy of his challenged registration as well as a draft Federal Complaint.

66.    Specifically, on March 1, 2023, Griffin sent out the first of two C&D letters to a major business contact of Plaintiffs' chocolate and fudge products, Michael and Leah Levdanski

("the Levdanskis"), owners of "Partners in Chocolate, LLC" a development company formed to run Chocolate Moonshine-branded stores in Macy's Department Stores in New York City, Long Island, and New Jersey. In this first C&D letter, Griffin demanded that they immediately stop using the CHOCOLATE MOONSHINE challenged trademark and fraudulently asserted that Chocolatier "has been selling    [chocolate products] for over five years and now continuously since early 2022 using the CHOCOLATE MOONSHINE mark." Indeed, Griffin had been selling chocolate products under the "Chocolate Moonshine" mark for over five years, **but only as a licensee of Moonshine Co. while Griffin was a junior partner of Chocolatier, which license effectively was revoked in 2019.** A copy of this C&D letter is attached hereto as **Exhibit 25**.

67.     On May 4, 2023, after not hearing back from the Levdanskis, Griffin through his attorney sent the Levdanskis a second C&D letter, via courier and email, threatening to sue them in federal court for trademark infringement, along with a copy of Griffin's challenged trademark registration and a draft Federal Complaint. Michael Levdanski forwarded Griffin's email and attachments to Warman the same day, stating: "Hi Chris, looks like they are not stopping but escalating in a bigger way." Copies of this email string as well as the attached documents are attached hereto as **Exhibit 26**.

68.     Moonshine Co. and the Levdanskis' company, Partner's in Chocolate, LLC, have been deeply involved in a potential national rollout of Chocolate Moonshine-branded stores within Macy's Department Stores. A draft of a Temporary License Agreement between Macy's and Moonshine Co., which agreement now is in jeopardy because of Griffin's fraudulent actions, is attached hereto as **Exhibit 27**.

69.     As of this date, the rollout of Chocolate Moonshine-branded stores in

Rockefeller Plaza, Bryant Park, Union Square and One World Trade Center in New York has been put on hold because of the threatening letters received by the Levdanskis. Warman has been told that the Levdanskis have a fiduciary duty to their investment partners to inform them of the malicious threats by Griffin against their company and future business plans. The cessation of these future business plans with the Levdanskis and Macy's will no doubt cause Plaintiffs to potentially lose tens of millions of dollars. An affidavit by Michael Levdanski attesting to these facts is attached hereto as **Exhibit 28**.

70.     On March 2, 2023, Griffin sent out the first of two C&D letters to another business partner and retail vendor of Moonshine Co., Michael and Leticia Montes ("the Montes"), owners of Chocolate Mayhem, LLC, who sell Plaintiffs' chocolate and fudge products in their retail store located in Allen, Texas. The C&D letter contained the same demands that were made in the first C&D letter to the Levdanskis. In addition, the landlord of their retail store was threatened by Griffin that they also would be sued for operating an establishment under the CHOCOLATE MOONSHINE challenged trademark.

71.     On May 4, 2023, the Montes received a second Cease and Desist letter from Griffin via courier and email, which essentially was the same C&D letter sent to the Levdanskis, along with Griffin's challenged trademark registration and a draft Federal Complaint. A copy of this email as well as the draft Federal Complaint are attached hereto as **Exhibit 29.** (The challenged trademark registration is the same as attached in Exhibit 26). The Montes contacted Warman, pleading with him for help, as their retail store is their sole source of income for their family.

72.     On May 8, 2023, Griffin sent a first C&D letter via courier (which included a copy of the challenged trademark at the end of the letter as well as an attached draft Federal

Complaint) to another retail vendor of Warman and Moonshine Co., Mark and Gayle DiCicco ("the DiCiccos"), owners of DiCicco's Delectables LLC, who sell Plaintiffs' chocolate and fudge products in their retail store located in O'Fallon, Missouri. This C&D letter essentially included the same demands that were in the second C&D letters sent to the Levdanskis and the Montes. On May 8, 2023, Gayle DiCicco sent Warman an email, forwarded to the undersigned counsel, containing copies of the C&D letter and the draft Federal Complaint. A copy of this email as well as the draft Complaint are attached hereto as **Exhibit 30**.

73.     On May 15, 2023, Griffin sent yet another first C&D letter via courier, along with the challenged registration and a draft Federal Complaint to Warman and Moonshine Co.'s retail vendor Brian and Lisa Griffin ("the Griffins") (no relation to Defendant Griffin), owners of The Fudge Life LLC, located in Providence Village, Texas, who had only been in business for a few months, having opened their business in February 22, 2023. They started selling Plaintiffs' chocolate and fudge products on February 25, 2023. The Griffin's participated in their first event to sell Plaintiffs' chocolate and fudge products on April 1, 2023.

74.     The C&D letter sent to the Griffins included the same demands made in the DiCiccos' letter as well as the same threatening draft Federal Complaint and Griffin's challenged registration. After receiving the C&D letter, the Griffin's sent an email to Warman attaching the documents sent to them via courier.  experienced much fear and anxiety about the future of their business, their family, and their relationship with Moonshine Co. and do not know whether to continue selling Moonshine Co.'s chocolate and fudge products. A copy of the email, the C&D letter and the draft federal complaint are attached hereto as **Exhibit 31.** (The challenged trademark registration is the same as attached in Exhibit 26).

75.     Thus, Griffin and Chocolatier/CCC's repayment to Warman for Warman's

kindness, assistance, and guidance by initially setting Griffin up in Warman's lucrative business in 2015 has been to systematically and intentionally dismantle Warman's life's work and to enrich themselves at Warman's expense by: (1) Griffin fraudulently holding himself out as the owner of Moonshine Co. to Plaintiffs' business partners, event promoters, retail vendors, and customers; (2) infringing Plaintiffs' Marks; (3) tarnishing Moonshine Co.'s stellar reputation; (4) intentionally and maliciously interfering with Plaintiffs' business relationships; (5) misappropriating Plaintiffs' customers; (6) preventing Moonshine Co. from participating in dozens of Comic Cons and related events around the United States; (7) converting Plaintiffs' chocolate and fudge products and the trade secret fudge recipe; and (8) misappropriating millions of dollars of revenue and fraudulently interfering with Moonshine Co.'s ability to rightfully achieve sales in the tens of millions of dollars, both of which otherwise would have gone to Plaintiffs.

## COUNT I
## TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1125(a)

76.     Paragraphs 1-74 of this Complaint are incorporated by reference as if fully set forth herein.

77.     Plaintiffs have been continuously and exclusively using the CHOCOLATE MOONSHINE, CHOCOLATE MOONSHINE CO. and CHOCOLATE MOONSHINE CO. ILLEGALLY GOOD Marks in connection with the manufacture and sale of their proprietary chocolate and fudge products for at least ten years in commerce and for at least eight years in interstate commerce via their website.

78.     Plaintiffs' long term use of the CHOCOLATE MOONSHINE, CHOCOLATE MOONSHINE CO. and CHOCOLATE MOONSHINE CO. ILLEGALLY GOOD Marks in connection with their manufacture and sale of chocolates and fudge products has generated

substantial goodwill associated with Plaintiffs' Marks among Moonshine Co. customers, who have come to associate Plaintiffs' Marks with outstanding and superior chocolate and fudge products in the state of Pennsylvania, in the United States, and indeed around the world.

79.     Defendants know that Plaintiffs have been using Plaintiffs' Marks in connection with Plaintiffs' chocolate and fudge products for at least ten years.

80.     Defendants have been selling Plaintiffs' chocolate and fudge products under the CHOCOLATE MOONSHINE mark, which is identical to one of Plaintiffs' marks and nearly identical to Plaintiffs' other two marks, in competition with Plaintiffs.

81.     Defendants also have been falsely representing themselves as the owner of Chocolate Moonshine Co. LLC.

82.     Defendants' sale of Plaintiffs' chocolate and fudge products under the CHOCOLATE MOONSHINE mark and holding themselves out as the owner of Chocolate Moonshine Co. LLC is likely to cause confusion, mistake or to deceive as to there being an affiliation, connection or association between Defendants and Plaintiffs.

83.     Defendants' conduct is being done willfully and with knowledge that such conduct will create a likelihood of confusion among the consuming public.

84.     Defendants are intentionally attempting to trade on the goodwill of Plaintiffs and to appropriate the same for the benefit of Defendants.

85.     Plaintiffs have been damaged by Defendants' actions.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

86.     Paragraphs 1-85 of this Complaint are incorporated by reference as if fully set forth herein.

87.     Plaintiffs have a business relationship with Wizard World/Fan Expo which

provides economic benefit to Plaintiffs.

88.    Defendants know of the business relationship between Plaintiffs and Wizard World/Fan Expo and its economic benefit to Plaintiffs.

89.    Defendants intentionally interfered with this business relationship without justification by misrepresenting to Wizard World/Fan Expo that Defendants own Moonshine Co. and that they have rebranded Moonshine Co. to Copper Coast Confections.

90.    Defendants' intentional interference has disrupted the business relationship between Plaintiffs and Wizard World/Fan Expo and has caused financial harm.

91.    Plaintiffs have a business relationship with Anthrocon/Furry Con which provides economic benefit to Plaintiffs.

92.    Defendants know of the business relationship between Plaintiffs and Anthrocon/Furry Con and its economic benefit to Plaintiffs.

93.    Defendants intentionally interfered with this business relationship without justification by misrepresenting to Anthrocon/Furry Con that Moonshine Co. has been rebranded to Copper Coast Confections.

94.    Defendants' intentional interference has caused harm to Plaintiffs.

95.    Plaintiffs have a business relationship with the Wateskas which provides economic benefit to Plaintiffs.

96.    Defendants know of the business relationship between Plaintiffs and the Wateskas and its economic benefit to Plaintiffs.

97.    Defendants intentionally interfered with this business relationship without justification by misrepresenting to the Wateskas that Defendants own Moonshine Co. and have switched to operating under a different brand. Further, Defendants have intentionally copied the

Wateskas retail store operation, have intentionally slandered the Wateskas, and have intentionally blocked the Wateskas from participating in events to sell Plaintiffs' chocolate and fudge products.

98.     Defendants' intentional interference has ended the business relationship between Plaintiffs and the Wateskas and has caused financial harm.

99.     Plaintiffs have a business relationship with the Levdanskis which provides economic benefit to Plaintiffs.

100.    Defendants know of the business relationship between Plaintiffs and the Levdanskis and its economic benefit to Plaintiffs.

101.    Defendants intentionally interfered with this business relationship without justification by falsely stating that Defendants have been selling chocolate and fudge products under the CHOCOLATE MOONSHINE mark for over five years and that they own the CHOCOLATE MOONSHINE challenged trademark. Further, Defendants have threatened to sue the Levdanskis if they continue using the CHOCOLATE MOONSHINE challenged trademark.

102.    Defendants' intentional interference has disrupted the business relationship and economic benefit between Plaintiffs and the Levdanskis resulting in financial harm.

103.    Plaintiffs have a business relationship with the Montes which provides economic benefit to Plaintiffs.

104.    Defendants know of the business relationship between Plaintiffs and the Montes and its economic benefit to Plaintiffs.

105.    Defendants intentionally interfered with this business relationship without justification by misrepresenting to the Montes that Defendants have been selling Defendants'

chocolate and fudge products under the CHOCOLATE MOONSHINE mark for over five years and own the CHOCOLATE MOONSHINE challenged trademark. Further, Defendants have threatened to sue the Montes if they continue to use the CHOCOLATE MOONSHINE challenged trademark.

106.    Defendants' intentional interference has disrupted the business relationship between Plaintiffs and the Montes and caused harm to Plaintiffs.

107.    Plaintiffs have a business relationship with the DiCiccos which provides economic benefit to Plaintiffs.

108.    Defendants know of the business relationship between Plaintiffs and the DiCiccos and its economic benefit to Plaintiffs.

109.    Defendants intentionally interfered with this business relationship without justification by misrepresenting to the DiCiccos that Defendants have been selling their chocolate and fudge products under the CHOCOLATE MOONSHINE mark for over five years and own the CHOCOLATE MOONSHINE challenged trademark. Further, Defendants have threatened to sue the DiCiccos if they continue to use the CHOCOLATE MOONSHINE mark.

110.    Defendants' intentional interference has disrupted the business relationship between Plaintiffs and the DiCiccos and caused harm to Plaintiffs.

111.    Plaintiffs have a business relationship with the Griffins which provides economic benefit to Plaintiffs.

112.    Defendants know of the business relationship between Plaintiffs and the Griffins and its economic benefit to Plaintiffs.

113.    Defendants intentionally interfered with this business relationship without justification by misrepresenting to the Griffins that Defendants have been selling their chocolate

and fudge products under the CHOCOLATE MOONSHINE mark for over five years and own

the CHOCOLATE MOONSHINE challenged trademark. Further, Defendants have threatened

to sue the Griffins if they continue to use the CHOCOLATE MOONSHINE mark.

114.     Defendants' intentional interference has disrupted the business relationship

between Plaintiffs and the Griffins and caused harm to Plaintiffs.

**COUNT III**
**TORTIOUS INTERFERENCE BY DEFENDANTS**

115.     Paragraphs 1-114 of this Complaint are incorporated by reference as if fully set

forth herein.

116.     Griffin has deceived many event promoters into believing that he is the owner

of Moonshine Co. and has rebranded the company name to Copper Coast Confections.

117.     Griffin fraudulently sold Plaintiffs' chocolate and fudge products under the

Copper Coast Confections brand at many of those events. A great number of those events were

provided by Warman. Those events only allow one seller.

118.     Defendants purposely are continuing to be the only seller at many of those events

knowing that they are selling Plaintiffs' chocolate and fudge products without Plaintiffs'

authorization.

119.     Defendants' intentional interference, without justification, is damaging Plaintiffs

and preventing Plaintiffs from getting their chocolate and fudge products into those events and

is preventing sales.

**COUNT IV**
**CONVERSION UNDER PENNSYLVANIA LAW**

120.     Paragraphs 1-119 of this Complaint are incorporated by reference as if fully set

forth herein.

121.    Defendants have intentionally taken Plaintiffs' chocolate and fudge products and trade secret fudge recipe from Plaintiffs in order to sell Plaintiffs' chocolate and fudge products without Plaintiffs' consent and without lawful justification, thereby interfering with Plaintiffs' use, possession and sale of Plaintiffs' chocolate and fudge products and trade secret fudge recipe.

122.    As a result of Defendants' conversion of Plaintiffs' chocolate and fudge products and trade secret fudge recipe, Plaintiffs have suffered actual and irreparable harm and are entitled to compensatory damages attributable to, and an injunction against, further ongoing conversion by Defendants.

## COUNT V
## BREACH OF CONTRACT BY DEFENDANTS

123.    Paragraphs 1-122 of this Complaint are incorporated by reference as if fully set forth herein.

124.    Defendants had a license with Plaintiffs in which they would sell Plaintiffs' chocolate and fudge products under Plaintiffs' Marks and pay Plaintiffs a certain percentage of Defendants' revenue from the sales.

125.    Plaintiffs supplied their chocolate and fudge products to Defendants.

126.    Defendants fraudulently diverted sales revenue from Defendants' sale of Plaintiffs' chocolate and fudge products sold under Plaintiffs' Marks.

127.    Plaintiffs sustained damages of over a million dollars due to Defendants' breach.

## COUNT VI
## UNJUST ENRICHMENT UNDER PENNSYLVANIA LAW

128.    Paragraphs 1-127 of this Complaint are incorporated by reference as if fully set forth herein.

129.    Plaintiffs conferred a benefit on Defendants by granting them a license to sell

Plaintiffs' chocolate and fudge products under Plaintiffs' Marks.

130.    Defendants appreciated the benefit.

131.    Defendants are retaining and greatly profiting from the benefit even though Plaintiffs' license to Defendants was revoked.

132.    The circumstances are such that it would be inequitable for Defendants to retain the benefit without compensating Plaintiffs for the full value of this benefit.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiffs pray for relief as follows:

1.    An injunction enjoining Defendants, their agents, their employees, their attorneys, their successors, their assigns, their affiliates, their entities owned and controlled by Defendants, and all those acting in concert or participation with Defendants, and each of them who receives notice directly or otherwise of such injunction from:

a.    Selling, distributing, manufacturing, importing, offering for sale, advertising, or promoting any product bearing any simulation, reproduction, copy or colorable imitation of confusingly similar Marks to Plaintiffs Marks such that it is likely to deceive, mislead, or confuse the public into believing that Defendants' chocolate and fudge products in any way originate with, are sanctioned by, or are affiliated with Plaintiffs;

b.    otherwise competing unfairly with Plaintiffs in any manner;

c.    instructing, assisting, aiding or abetting any other person or entity in engaging in or performing any of the activities that could cause harm to Plaintiffs Marks or cause confusion; and

d.    disposing of, destroying, altering, moving, removing, concealing, tampering

with or in any manner secreting any physical evidence or documents (including computer records) of any kind, including invoices, correspondence, books of account, receipts or other documentation relating or referring in any manner to the manufacture, advertising, receipt, acquisition, importation, purchase, sale, offer for sale, and/or distribution of any merchandise infringing Plaintiffs' Marks or any, reproduction, counterfeit, copy, colorable imitation, or confusingly similar mark thereof.

2.     An injunction preventing Defendants from selling Plaintiffs' chocolate and fudge products;

3.     A judgment of trademark infringement by Defendants;

4.     A judgment of tortious interference under Pennsylvania law;

5.     A judgment of conversion under Pennsylvania law;

6.     A judgment of breach of contract under Pennsylvania law;

7.     A judgment that Defendants have been unjustly enriched;

8.     A judgment that Defendants' actions are exceptional;

9.     A judgment and order requiring Defendants to pay Plaintiffs three times any profit, supplemental damages, or a reasonable royalty from any infringement up until entry of the final judgment, with an accounting, as needed;

10.     A judgment and an order requiring Defendants to pay Plaintiffs pre-judgment and post-judgment interest on any damages or profits awarded;

11.     An award of punitive damages for Defendants' tortious interference.

12.     An award of Plaintiffs' attorney's fees for bringing and prosecuting this action;

13.     An award of Plaintiffs' costs and expenses incurred in bringing and prosecuting

this action; and

14.     Any other relief that may be requested or granted by the Court.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

a trial by jury for all issues triable by a jury.

Respectfully submitted,

**ACKER WOOD INTELLECTUAL
PROPERTY LAW, LLC**

/s/Gwen R. Acker Wood
Gwen R. Acker Wood (PA ID No. 89081)

4981 McKnight Road
Pittsburgh, PA 15237
412.486.1038
412.487.2837 (fax)
grwood@ackerwoodiplaw.com

*Attorney for Plaintiffs*